UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 2:05-CR-28 |
| V. ) | District Judge Greer |
| ) | Magistrate Judge Inman |
| JOE L. DAVIS, SR. ) | |

REPORT AND RECOMMENDATION

The defendant has filed a Motion to Suppress all evidence seized from him, or from his motel room, on October 31, 2004 [Doc. 9]. Presumably the evidence which defendant seeks to have suppressed is cash and crack cocaine seized from his person immediately after his arrest, and a handgun found after a search of the motel room defendant was occupying at the time of his arrest. This motion was referred to the United States Magistrate Judge under the standing orders of this Court and pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on August 19, 2005.

On October 30, 2004, there was an outstanding warrant for defendant's arrest for violation of the conditions of his parole. Detective Chris Blair of the Morristown, Tennessee Police Department received information from an informant that defendant had rented a room at the Holiday Inn on the West Andrew Johnson Highway in Morristown. Based on this tip, Detective Blair went to the motel around midnight, i.e., in the early morning hours of October 31, and talked to the night desk clerk. The clerk told Detective Blair that a man matching defendant's description tried to rent the room

but, inasmuch as he had no identification, his wife (who did have identification) actually rented the room. The clerk showed a copy of the registration information to Detective Blair, which included a photocopy of a driver's license issued to "Martha Davis." Detective Blair personally knew both the defendant and his wife, Martha Davis. He recognized not only Mrs. Davis's name on the driver's license, but also her photograph thereon. The cash receipt for the room was made out to "Johnny Simpson," a person unknown to Detective Blair. "Johnny Simpson" did not and does not exist; Detective Blair assumed then, and still assumes, that Johnny Simpson was an alias being used by defendant. Although irrelevant to any issue regarding this motion to suppress, Detective Blair's assumption is likely correct.

At this point, having information from an informant that defendant was occupying a room at the motel, and having seen documentation from the motel that Mrs. Davis had rented Room No. 140, the Detective asked the clerk if there was a room or other area in the motel that he could use to observe Room 140. The clerk directed him to the conference room, which was a large room with many windows that had a clear view of Room 140. Detective Blair obtained binoculars from his vehicle and began surveillance of Room 140. Detective Blair was looking from the conference room across a courtyard or parking area directly at defendant's room. Although it obviously was during the nighttime, all exterior areas of the motel, including the area around the door of Room 140, were well-lit. The binoculars used by Detective Blair

were large and of high quality, having extreme magnification as well as being equipped with an electronic "anti-shake" function. Soon, Detective Blair observed a man exit Room 140 and then stand outside it. The man had a handgun, which he pointed up in the air as he looked about the area. As already noted, Detective Blair knew defendant and immediately recognized him. More importantly, Detective Blair knew defendant was "confrontational," i.e., potentially violent. Detective Blair noted defendant's behavior in exiting the room and then looking about the area while holding a handgun in the ready position. Detective Blair concluded, and rightly so, that this behavior was erratic and aggressive, and it reasonably suggested to him that defendant might be under the influence of drugs. Therefore, Detective Blair prudently called for assistance; a number of police officers, including the MPD SWAT team, came to the Holiday Inn and took up positions at various points. Some officers went to the conference room of the motel where they assisted Detective Blair with his surveillance of defendant's motel room. Throughout these hours of darkness, defendant came out of, and then re-entered, his motel room several times. Each time defendant had the gun on his person, usually in his hand being waved about, and at least one time stuck in the waistband of his trousers. Moreover, throughout the wee hours of the morning of October 31, a succession of different people came to Room 140, some of whom were admitted and left shortly thereafter, and some of whom were never admitted. Some of those who were allowed to enter and then left, later returned. Some of those denied

admittance went to the motel office and requested that the clerk telephone Room 140. The clerk did so, and no one answered the phone. Bearing in mind that defendant was a known drug dealer, any private citizen with a modicum of common sense, not to mention a trained police officer, would reasonably conclude that defendant was selling narcotics from the motel room.

Night turned to day as the police officers maintained their vigil. Shortly before noon on October 31, Detective Blair talked to Bonnie Eckenrod, the Front Desk Supervisor of the Holiday Inn who, by that time, was on duty. Ms. Eckenrod, of course, had been fully apprised of what had been transpiring in her motel throughout the preceding night. At approximately 11:45 a.m., Detective Blair asked Ms. Eckenrod if defendant was checking out of the motel. She told Blair that she had heard nothing from Mr. or Mrs. Davis. At no earlier than 12:01 p.m., Ms. Eckenrod called Room 140. A male answered, groggily, leading Ms. Eckenrod to believe that she had just awakened him. Ms. Eckenrod identified herself as the front desk clerk. She told the person that checkout time was noon, and she asked the occupants' intentions. The man answered, "I'll call you back." Within forty-five seconds of the end of that phone call, defendant walked out of Room 140, looked about, and then walked back in, leaving the door to the room partly opened. The SWAT team officers, who were in the adjoining room, immediately burst in and placed defendant under arrest.

A search of defendant's person revealed an amount of cash and a quantity of

crack cocaine, but no gun.

Detective Blair secured a "consent to search" [Exhibit 7] from Ms. Eckenrod, pursuant to which the officers searched the room and found a loaded and cocked handgun sandwiched between clothing in a plastic Wal-Mart bag lying on the motel room floor, perhaps eight feet from where defendant was sitting when the officers entered.

Two discrepancies in the evidence must be addressed. First, Detective Blair testified that he went to the Holiday Inn and commenced his surveillance at or near midnight, whereas the transcript of his testimony before Judge Ward of the Hamblen County Sessions Court indicates that he commenced his surveillance sometime around 3:00 a.m. Detective Blair acknowledged this discrepancy, saying that he may be confused about the time, but about the other detailed facts he was unequivocally certain. Detective Blair was extremely credible and articulate, and his explanation for the discrepancy is accepted. Moreover, the time his surveillance began, whether at midnight or at 3:00 a.m. is utterly inconsequential.

Of more significance is a discrepancy concerning the time of defendant's arrest. Detective Blair insists that it did not occur until after 12:00 noon on October 31, whereas the arrest report [Exhibit 2] reveals that the arrest occurred at 11:28 a.m. on October 30. The reason this is important is because the search of defendant's motel room, which resulted in the seizure of the handgun, was accomplished without a

5

warrant and pursuant to a "consent to search" executed by the clerk of the motel. If that search occurred before the expiration of defendant's licensed occupancy at 12:00 noon, then defendant had an expectation of privacy in that room that arguably was violated by the officers' search. This Court without hesitation concludes that defendant's arrest occurred *after* 12:01 p.m. on October 31, 2004. Ms. Eckenrod, the motel clerk, is a private citizen and, unlike either defendant or the police officers, she has no vested interest in the outcome of these proceedings. She was definite and unswerving in her testimony that it was no earlier than 11:45 a.m. when she was asked by Detective Blair if she had any information regarding defendant's intention to check out at the required hour of noon, and that she waited until 12:01 p.m. before calling the room to make inquiry of the occupants. She testified that Detective Blair told her that he "wanted to do this right," and for that reason both of them scrupulously observed the timing of the phone call to Room 140 and the officers' subsequent entry into that room to effect defendant's arrest. She also was extremely definite in her testimony that she signed the "consent to search" for Detective Blair at 12:03 p.m. Indeed, immediately following Ms. Eckenrod's signature on the consent to search form [Exhibit 7], she wrote "12:03 p.m." Ms. Eckenrod was credible and, as already noted, she has no interest in the outcome of this case from a personal standpoint. She was aware of the importance of the timing, and she and Detective Blair were careful to take the actions they did after 12:00 noon, the motel's checkout time. Her testimony, entirely

6

consistent with that of Detective Blair, is accepted by this Court, notwithstanding the arrest report which reflects that the time of arrest was 11:28 a.m. on October 30. Discrepancies will always arise in litigation, civil or criminal, and they must be resolved one way or the other. In this instance, it is resolved in favor of the government; the heavy preponderance of the evidence compels this Court to find that defendant was not arrested until some time after noon on October 31, and that the search of the motel room did not occur until immediately after his arrest pursuant to a "consent to search" executed by Ms. Eckenrod.

With these discrepancies resolved, the Court will now address the legal issues. There are so many bases to uphold the search and seizure of this evidence that the Court scarcely knows where to begin.

Defendant's suggestion that these officers illegally entered the room is ludicrous. Obviously, no search warrant was needed to enter this motel room to effect defendant's arrest. For nearly twelve hours a contingent of Morristown police officers had observed defendant, whom they personally knew, leaving and then re-entering Room 140 at the Holiday Inn. The officers had a warrant for defendant's arrest, and they knew he was in the room. Nothing else was needed. *See, Payton v. New York*, 445 U.S. 573, 603 (1980).

Defendant's suggestion that the officers violated the "knock and announce" rule is untenable. Throughout the night, defendant was observed coming out of his room

7

and holding a gun, either at his side or up in the air. He was known to the officers to be "confrontational." Drugs were likely in the motel room; defendant faced incarceration as a result of violation of his parole, and he faced additional incarceration if narcotics were discovered in his possession. So what should reasonably prudent police officers do at this time? Serenely knock on the door, identify themselves, and ask defendant to come out? To do so would have invited violence, probably deadly violence. The safety and lives of the officers were at stake, and the safety and the lives of defendant and his wife also were at stake. Add to this the safety and lives of other occupants of the motel, and all the other innocent bystanders in the area. It bears noting that this area of Morristown is highly congested and that the traffic on the West Andrew Johnson Highway is heavy, especially at noon. The officers rightly determined to enter the room without first knocking and announcing their presence and purpose. Defendant's propensity for violence, the fact that he had been observed all through the previous night with a handgun, and his apparent erratic behavior, constituted exigent circumstances warranting the officers' unannounced and uninvited entry into the motel room. *See, Wilson v. Arkansas*, 514 U.S. 927 (1995). To the extent that the "knock and announce" rule might apply to execution of *arrest* warrants, exigent circumstances existed to dispense with that requirement.

Obviously, defendant was lawfully arrested inasmuch as there was a warrant directing the officers to do so. That being so, the officers validly searched defendant's

person as an incident to that arrest. *See*, *United States v. Robinson*, 414 U.S. 218 (1973). Thus, the discovery and seizure of the cash and crack cocaine, seized after a search of defendant's person incident to his arrest, was legitimate under the Fourth Amendment and evidence thereof should not be suppressed.

The search of the motel room resulted in the discovery of the *cocked* handgun which was sandwiched between some articles of clothing in a plastic Wal-Mart bag. Defendant argues that this was a warrantless search of his personal effects in which he had a reasonable expectation of privacy which the officers violated, and that evidence of the handgun therefore should be suppressed.

At the outset, as discussed earlier in this report, Ms. Eckenrod's testimony is accepted without qualification or hesitation. She testified that defendant was not arrested until some time after 12:01 p.m. on October 31, that the rental agreement subsisting between the motel and the defendant provided that checkout time was noon, that defendant (or Mrs. Davis) never renewed their license on Room 140 to stay for another day, and that she executed the "consent to search" at 12:03 p.m. on October 31.

Although a guest of a motel or hotel undeniably has an expectation of privacy in his rented room for purposes of the Fourth Amendment, that expectation of privacy dissipates upon the expiration or termination of that guest's rental period. *See, United States v. Allen*, 106 F.3d 695, 699 (6th Cir. 1997). Defendant's rightful occupancy of
9

this room terminated at noon. His vague comment to Ms. Eckenrod that he would call her back does not in any way serve to extend his rightful occupancy of the room. For one thing, he could have called back and said, "we're leaving." For another thing, the motel receipt issued to Ms. Davis upon check-in indicated that she paid cash for the room; no no credit card was involved. Thus, to renew their occupancy of the room, Mr. or Mrs. Davis would have been required to have gone to the desk and paid an additional $72.14 for another day's stay. Lastly, noon had already come and gone, albeit slightly; the *lawful* occupancy of Mr. and Mrs. Davis in Room 140 had come to an end a few minutes earlier. All this being true, defendant no longer had an expectation of privacy in the motel room and full "custody" of that motel room had reverted to the Holiday Inn. As a result, Ms. Eckenrod could validly consent to the search of that room, which she did, in writing [Exhibit 7].[1] Defendant argues that the "consent to search" did not extend to his personal effects within the room. There is simply no logic to this argument. Defendant's rightful tenancy in that room had ended; the situation was no different than if defendant and Mrs. Davis had "skipped" and abandoned all their personal property in the room. The motel staff would have been within its rights to have searched through those personal effects; in fact, they would have been derelict had they not done so. Similarly, as custodians of this personal property in the motel room, the motel clearly had authority to consent to a search of

---

[1] It bears repeating: when Ms. Eckenrod signed the consent to search, she carefully noted the time immediately after her signature: "12:03 p.m."

this personal property by the police. Indeed, the *Allen, supra*, case explicitly concerned *contents* of the motel room:

> [By terminating the defendant's occupancy,] the motel manager divested Allen of his status as an occupant of the room and concomitantly terminated his privacy interest *in its contents*. Once the manager, through private action, took possession of the motel room, Allen could no longer assert a legitimate privacy interest *in its contents*. The manager's consent to the officers' search of the room was all that was required to avoid constitutional infirmity.

106 F.3d at 695. [Italics supplied.]

The Court also agrees with the government's argument that the handgun would have inevitably been discovered. Since defendant had been seen brandishing a gun throughout the preceding twelve hours, and since no gun was found upon him at the time of his arrest, it logically follows that this gun had to be somewhere in that motel room. Defendant's occupancy had been terminated on either of two bases: he had failed to renew his contractual occupancy by the check-out time, and he had just been arrested.[2] The gun would have been inevitably discovered in any event since the officers knew the gun was in the room. In *United States v. Gonzales,* 1995 WL 49109 (6th Cir. 1995), the motel manager entered defendant's room upon the belief that the occupant had left, and observed an abandoned wallet. The manager secured the room to protect the contents. Subsequently, after hearing that his renter had been arrested at

---

[2]The fact that defendant had been arrested and thereby precluded from renewing his occupancy is of no significance. *See, United States v. Gonzales*, 1995 WL 49109 at *2 (6th Cir. 1995), and cases cited therein.

11

some other location, the manager called the police and invited them to enter the room. The officers observed a locked box in the motel room, which they opened without a warrant; it was found to contain $17,000 in cash. With respect to this incriminating evidence, the Sixth Circuit panel stated:

> Moreover, even if the search of the locked box was questionable at its inception, it appears that the police acted within their authority when they took custody of all of the personal items in the room and transferred them to headquarters for inventory and safekeeping. Certainly, it would have been reasonable at that point to inspect and list the box and its contents as part of the police department's inventory procedure, and the $17,000 in cash would inevitably have been discovered and offered as evidence in the prosecution of the defendant. Hence, if the officer's action in opening the locked box while still in the motel room was constitutionally suspect, it was no more than premature and fails to provide an adequate ground for suppression. *Cf. United States v. Johnson*, 22 F.3d 674, 684 (6th Cir. 1994) ("If the circumstances are such that the evidence would have been found in any inventory search that inevitably followed seizure, . . . the evidence could be introduced under *Nix* [*v. Williams,* 467 U.S. 431, 444 (1984)].")

1995 WL 49109 at *3.

Additionally, the issue of public safety cannot be cavalierly ignored. For many hours, these officers had watched defendant waving a handgun, and that handgun was not found on his person. Thus, the handgun had to be in the motel room. This, of course, implicates the authority of the police to take control of all of the personal property in the room and then transport it to police headquarters for subsequent inventory and safekeeping which, in turn, implicates the inevitable discovery issue

clearly addressed in *Gonzales, supra*. In this regard, it must be borne in mind that the handgun in this case has a dual nature. It is not only the evidence of the crime with which the defendant is presently charged, it is *also*, and more importantly, a dangerous instrumentality which the officers knew, from their earlier surveillance of nearly twelve hours, was *somewhere* in a small motel room. Every moment that this weapon was unsecured compounded the danger of an unnecessary tragedy. Unlike drugs, papers indicating fraud, or burglary tools which are only evidence of crimes, the gun could easily kill or maim. Indeed, it was cocked and loaded. It was entirely possible that even one of the officers or hotel staff picking up the bag where it was ultimately found for safekeeping could have caused its discharge. It is its independent character as a danger in its own right which distinguishes this weapon from mere evidence, and which created the exigent circumstance for its swift location and neutralization.

Defendant relies upon two cases to support his argument that the search of the motel room, and specifically the Wal-Mart bag in which the gun was hidden between articles of clothing, was constitutionally infirm. Firstly, he relies upon *United States v. Bass*, 2002 WL 1378219 (6th Cir. 2002). In *Bass*, the defendant was arrested on the hotel premises *before he had exited his vehicle*. Thereafter, after being requested by hotel management to make sure the room defendant had rented was "safe and secure," the officers searched the defendant's room. The arresting officers found therein a duffel bag, which they searched, and which was found to contain documents ultimately

13

leading to defendant's indictment for fraud. The Court of Appeals found that defendant had a reasonable expectation of privacy in his hotel room and that evidence of these incriminating papers should be suppressed. But *Bass* is easily distinguishable from the facts before this Court. In *Bass*, *defendant's right of occupancy had not been terminated*; in other words, the defendant remained a lawful occupant of the room at the time of the search, and hotel management had no right to consent to a search of his room. *Id.,* at **2. This is a critical fact that distinguishes *Bass* from the case before this Court. The Sixth Circuit in *Bass* also held there were no exigent circumstances justifying a warrantless search of the defendant's hotel room, finding that there was no evidence of imminent danger to any other hotel guest. *Id.,* at **3. Lastly, in *Bass* the Sixth Circuit held that the inevitable discovery exception did not apply inasmuch as the hotel's procedure regarding abandoned property would not have involved the police. What differentiates the facts in *Bass* from the facts of the case before this Court is the presence of a *gun*. The Morristown police officers saw defendant brandishing a gun all through the night, and that gun was not found on him after his arrest. Thus, the gun had to be in the motel room. Again, it bespeaks the obvious to say that a loaded handgun is dangerous. The *Bass* court stated, in suppressing the contents of the duffel bag, that "there was no evidence that there would be any persons *or other dangers* in Bass's hotel room." *Id.,* at **3 [Emphasis supplied]. However, there was a known danger in defendant's Davis's motel room.

14

Defendant also relies on *Commonwealth of Pennsylvania v. Brundidge*, 620 A.2d 1115 (1993). In *Brundidge*, the Pennsylvania Supreme Court held that a hotel guest does retain "a reasonable expectation of privacy *to the contents* of discrete and concealed personal property in a motel room after checkout time." *Id.*, at 1118. Firstly, that does not appear to be the law in the Sixth Circuit; *cf. United States v. Allen, supra.* Second, *Brundidge* did not involve the existence of a *known* dangerous weapon that necessarily had to be concealed somewhere within the motel room.

Lastly, it would not be a stretch of the law to find that the search of the motel room was incidental to defendant's arrest. Since defendant had been seen throughout the night with a hand gun, and since that gun was not found on his person upon his arrest, it necessarily was secreted in the motel room. Bearing in mind the size and configuration of a motel room, anything in that room was within defendant's reach, certainly within "lunge" reach. It makes no difference that defendant was by that time in custody and under control. In *United States v. Kaye*, 492 F.2d 744 (6th Cir. 1974), the defendant had been arrested and was under control. A warrantless search of the suitcase being carried by that defendant revealed incriminating evidence. In finding that the search of the suitcase was valid, the Court of Appeals held that

> [a] search incident to arrest may extend to "the arrestee's person and the area 'within his immediate control' – construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 753, 763; 89 S.Ct. 2034, 2040; 23 L.Ed.2d 685 (1969). Appellant's suitcase was within that area at the time of his arrest. It is true [as defendant contends] that

15

> [defendant] had been subdued and presented no danger to the
> police at the time the suitcase was opened. Nor was there the
> possibility that the evidence in the suitcase would be destroyed
> as the suitcase was under the control of the police. However,
> the authority to conduct a search incident to an arrest, once
> established, still exists even after the need to disarm and
> prevent the destruction of evidence has been dispelled.

492 F.2d at 746.

The pile of clothing in which this gun was found was within eight to ten feet of defendant, certainly within his grasp had he lunged from his chair. And lest it be forgotten, defendant's wife also was in the room and could have retrieved the weapon. The fact that they could not have grabbed it because they were under control is completely beside the point under the authority of *Kaye, supra.* Again, the police *knew* a gun was in that room.

For all, or any, of the foregoing reasons it is respectfully recommended that defendant's motion to suppress be DENIED.

Any objections to this report and recommendation must be filed within ten (l0) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985). The objecting party shall procure and file simultaneously with the objections a transcript of any testimony before the Magistrate Judge. If a transcript is not filed simultaneously with the objections, the party filing the objections shall either (1) file a declaration that the transcript was ordered before the objections were filed and the date on which the party expects the transcript to be filed, or (2) affirmatively state

that a transcript of the testimony presented to the Magistrate Judge is not needed for resolution of the objections. If a party files objections to this report and recommendation, the attorney for that party shall provide a copy of such objections to the opposing counsel on the same day the objections are filed, either by hand-delivery or facsimile transmission. The opposing counsel shall file his/her response to the objections within five business days of the date the objections are filed.

                                            Respectfully submitted,

                                            s/ Dennis H. Inman
                                          United States Magistrate Judge

17

Case 2:05-cr-00028-JRG   Document 33   Filed 08/22/05   Page 17 of 17   PageID #: 17